**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

TAMMY V. PHILLIPS,                              No. CIV S-05-0813-CMK

        Plaintiff,

    vs.                                    <u>MEMORANDUM OPINION AND ORDER</u>

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

_____/

        Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 22) and defendant's cross-motion for summary judgment (Doc. 23).

/ / /

/ / /

/ / /

/ / /

1

# I. BACKGROUND

Plaintiff applied for disability insurance supplemental security income benefits on February 28, 2002[1], based on disability.  In her application, plaintiff claims that her impairment began on September 3, 1994.  As to her impairments, plaintiff offers the following summary:

> In 1993, Plaintiff was thrown into a bathtub that resulted in a lumbar spine region disk protrusion and chronic back pain.  After a reduction in hours, changes in job duties, and increases in the number of rest breaks, as of September 3, 1994, Plaintiff was unable to work at all due to worsening back pain and fatigue, excessive vomiting, chest pain, lack of energy, diarrhea, headaches, wrist pain, and bad moods.  Prior to the onset of her disability, Plaintiff worked as a ticket person and as a fast food worker.  Plaintiff cannot return to work because of back pain, chronic pain, chronic fatigue, rheumatoid arthritis, muscle spasm, Epstein Barr virus and immune dysfunction, heart damage and chest pains, vomiting, diarrhea, weakness, wrist pains, and headaches.  Plaintiff is obese and her reported height ranges from 5'3" to 5'5", while the medical records record her weight between April 2000 and October 2003 as fluctuating between 214 pounds and 245.5 pounds. (citations to the record omitted).

Plaintiff is a United States citizen born April 21, 1966, with a high school equivalency.

Plaintiff's claim was initially denied.  Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on August 18, 2003, before Administrative Law Judge ("ALJ") F. Lamont Liggett.[2]

In his July 23, 2004, decision, the ALJ made the following findings:

1.  Previously on January 25, 1999, the claimant was found not disabled by an Administrative Law Judge pursuant to an earlier application for benefits. . . filed on November 13, 1995;

2.  A presumption of continuing nondisability arises from the decision issued on January 25, 1999, and the current Administrative Law Judge is in agreement with the prior decision of nondisability;

3.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability;

---

[1]    The record reflects that the application was actually filed on April 3, 2002, with a protective filing date of February 28, 2002.  Plaintiff signed the application on March 30, 2002.

[2]    This is plaintiff's second application.  Her first application was filed on November 13, 1995, and denied by a decision issued January 25, 1999.

4.      The claimant has an impairment or combination of impairments considered severe based on the requirements in the Regulations;

5.      The medically determinable impairments do not meet or medically equal one of the Listed impairments . . .;

6.      The undersigned finds the claimant's allegations regarding her pain and limitations not fully credible;

7.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments;

8.      The claimant has the residual functional capacity to perform light work that requires lifting/carrying 10 pounds frequently and 20 pounds occasionally, sitting, standing, and/or walking about 6 hours in an 8-hour workday; limitation for pushing/pulling with lower left extremity, and postural activities to be performed on an occasional basis;

9.      The claimant has past relevant work as a fast food worker and ticket person;

10.     The claimant is 38 years old, which is defined as a younger individual;

11.     The claimant has a high school equivalency education;

12.     Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Section 416.969 of [the Grids] directs a conclusion of not disabled;

13.     The claimant's capacity for light work has not been compromised by her exertional [and non-exertional] limitation[s]; accordingly, using the above-cited Rule as a framework for decision making, the claimant is not disabled; and

14.     The claimant was not under a disability as defined in the Social Security Act, at any time through the date of this decision.

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits.  On March 30, 2005, the Appeals Council issued an order acknowledging receipt into the record of: (1) a brief from plaintiff's attorney; (2) a letter dated August 27, 2004, from David N. Katz, M.D.; and (3) a letter dated September 1, 2004, from George Graman, M.D., with accompanying medical report dated May 2, 2003.  After the Appeals Council declined review, this appeal followed.

/ / /

## II.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## III.  DISCUSSION

In her motion for summary judgment, plaintiff argues: (1) the ALJ failed to give clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of her symptoms as not credible; (2) the ALJ's finding that plaintiff's condition has not substantially changed is not supported by substantial evidence; (3) the ALJ erred by improperly ignoring undisputed evidence regarding plaintiff's obesity and its effect on her ability to work; (4) the

ALJ failed to give specific and legitimate reasons for disregarding the opinions of the treating and examining physicians and the medical consultants; (5) the ALJ erred by improperly ignoring lay witness testimony; (6) in determining plaintiff's residual functional capacity, the ALJ overlooked significant relevant evidence; and (7) the ALJ's vocational finding, based on application of the Medical-Vocational Guidelines, lacked substantial evidence.

## A.    Plaintiff's Credibility

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

As to plaintiff's credibility, the ALJ stated:

The claimant testified that she received General Assistance and lives with her father. She stated she last worked in September 1994; she became tired all the time due to Epstein Barr Virus. During her first year off work she was on State disability. She named her impairments as Epstein Barr Virus, rheumatoid arthritis, and chronic fatigue, with back pain and chronic fatigue her most significant impairments. She gave her weight as 233 pounds stating Neurotin caused her weight gain. She testified that she has not had back surgery; but is receiving treatment; Dr. Katz treats and prescribes medications for all her ailments. The claimant testified that she can't lift over 15 pounds, bending and walking hurts and causes burning pain, she is unable to do housework and only takes a shower 1 to 2 times a week. An average day begins between 9 and 11 am when she takes her medications, gets dressed and goes to friends' houses. She takes a nap every day. She has a California Driver's license and drives down to the corner every day, no more than 5 miles a day. She goes to bed between 12 midnight and 2 am. She stated her pain level was a 10 in her lower back and up her spine, but Tylenol and back pain medication brings it down to a 7. The claimant was noted to stand, stretch, and then sit back down.

The undersigned found the claimant's testimony of disabling pain and the inability to engage in work activity to be somewhat exaggerated and not entirely credible. There are inconsistencies between the claimant's allegations and the entirety of evidence presented. Clinical findings do not support the amount of pain and limitations the claimant alleges; neither does the claimant's testimony support her being so impaired as to be unable to perform any work activities (all of the evidence indicates the claimant can perform work even at the sedentary level with no restrictions that would preclude work equivalent to her residual functional capacity) as the claimant has received standard preventative medical care and medication. Although she alleges a mental impairment, and has been prescribed medications, it has been found to be not severe and will improve with continued treatment and medication. Although the claimant's physical impairments may cause some discomfort, her allegations appear greater than what her condition would reasonably be expected to produce (hypersensitivity) (citation to record omitted). In any event, these impairments would not reduce the claimant's residual functional capacity below the sedentary level. In this regard, based on all of the above, the undersigned finds that the claimant retains the residual functional capacity to perform light exertional work.

Plaintiff argues that the ALJ erred in four ways with respect to this credibility finding:

1.      The ALJ erred by improperly discrediting plaintiff's allegations regarding the severity of her pain and limitations because they were not fully corroborated by objective medical evidence;

2.      The ALJ erred by improperly discrediting plaintiff's allegations regarding the severity of her symptoms and limitations regarding chronic fatigue syndrome;

3.      The ALJ erred by improperly discrediting plaintiff's allegations regarding the severity of her mental symptoms; and

4.      The ALJ improperly discredited plaintiff's allegations regarding the severity of her symptoms based on the plaintiff's receipt of standard preventative care.

As to plaintiff's first argument that the ALJ erred by discrediting her pain allegations because they were not fully corroborated by the record, plaintiff correctly notes that, where there is evidence of an underlying impairment, an ALJ may not discredit the plaintiff's pain testimony solely because it is uncorroborated.  However, the ALJ in this case did not discredit plaintiff's pain testimony <u>solely</u> because it was not corroborated.  To the contrary, the ALJ offered other reasons for rejecting plaintiff's testimony.  For example, the ALJ considered the effect of treatment and medication on plaintiff's pain.  <u>See</u> <u>Bunnell</u>, 947 F.2d. at 345-47.   He also considered the nature of the alleged pain symptoms in light of plaintiff's impairments.  <u>See</u> <u>id.</u>  The ALJ also considered the functional restrictions as opined by the medical sources.  <u>See</u> <u>id.</u>  Because the ALJ considered these factors, as well as lack of corroboration, the court must reject this argument.

Next, plaintiff argues that the ALJ erred by improperly discrediting her testimony regarding chronic fatigue:

> . . . [T]he record is replete with evidence of the degree of severity of Plaintiff's chronic fatigue syndrome and resulting limitations, and the ALJ erred by improperly discrediting Plaintiff's allegations regarding the severity of her fatigue and its resulting limitations.

Plaintiff does not specify, however, how the ALJ erred.  In fact, upon careful review of the ALJ's credibility finding, it does not appear that the ALJ rejected plaintiff's testimony regarding chronic fatigue.  Rather, the ALJ's credibility assessment focuses on plaintiff's pain allegations.

Next, plaintiff asserts that the ALJ erred by discrediting her testimony regarding her mental impairments.    Again, however, plaintiff does not specify how the ALJ erred.  With respect to plaintiff's testimony regarding mental limitations, the ALJ stated: "Although she

1   alleges a mental impairment, and has been prescribed medications, it has been found to be not

2   severe and will improve with continued treatment and medication."   Plaintiff appears to concede

3   the finding that her mental impairment is not severe.[3]  To the extent plaintiff challenges the

4   ALJ's consideration of the medical source opinions as to the impact of her mental functioning on

5   her ability to work, the court will address that issue in section III.D. below.

6              Finally, plaintiff asserts that the ALJ erred by referring to standard preventative

7   medical care.  Plaintiff argument, in its entirety, is as follows:

8              In this case the ALJ erred by improperly discrediting Plaintiff's
            allegations regarding the severity of her symptoms and limitations because
9           [of] her receipt of standard preventative medical care.  In fact, Plaintiff's
            medical care, both prescribed and administered, was more than standard
10          preventative care.  Salud Clinic medical records evidence ongoing pain
            management treatment with prescribed pain killers and antidepressants.
11          Additionally Salud Clinic provided Plaintiff with a referral to A. Bott,
            M.D., for chronic pain control and fibromyalgia.  Plaintiff received
12          General Assistance and does not have a medical insurance card.

13  As with plaintiff's other arguments, she does not specify how the ALJ erred.  Nor does plaintiff

14  cite to any authority in support of this argument.  To the extent plaintiff argues the ALJ erred by

15  referring to medications and treatment, the court rejects this argument.  See id.

16       **B.    Changed Circumstances**

17              Pursuant to Social Security Acquiescence Ruling ("AR") 97-4(9) and Chavez v.

18  Bowen, 855 F.2d 691 (9th Cir. 1988), an earlier administrative finding of non-disability creates a

19  presumption of continuing non-disability.  To overcome this presumption, the plaintiff must

20  prove that there are changed circumstances indicating a greater disability.  See Chavez, 844 F.2d

21  at 693.  "Changed circumstances" include attainment of a different age category, a new

22  impairment not previously considered, or a change in the plaintiff's condition.  See id.  Plaintiff

23  argues that the ALJ erred in applying AR 97-4(9) and Chavez by accepting a presumption of

24  continuing non-disability even though the record establishes changed circumstances.

25  _____

26       [3]         In her brief, plaintiff characterizes her mental impairment as "non-severe."

1  Specifically, plaintiff asserts that her new diagnosis of fibromyalgia, as well as a worsening of

2  her other impairments, constitutes changed circumstances sufficient to rebut the presumption of

3  continuing non-disability.  Plaintiff concludes that, in light of these changed circumstances, the

4  ALJ erred in finding that plaintiff had not rebutted the presumption.

5              As to this issue, the ALJ recognized the correct legal rule and stated:

6              After a thorough evaluation of the entire record including the claimant's
               allegations regarding her symptoms and limitations, the undersigned finds
7              that, prior to February 28, 2002, and to the present, the claimant has
               retained the residual functional capacity to perform a narrow range of light
8              work.

9  In his ultimate findings, the ALJ also stated that "[a] presumption of continuing nondisability

10 arises from the decision issued on January 25, 1999, and the current Administrative Law Judge is

11 in agreement with the prior decision of nondisability."  The ALJ also examined the current

12 record and found that "[plaintiff] has the residual functional capacity to perform light work . . ."

13 Based on this record, the court cannot agree with plaintiff that the ALJ erred with respect to

14 application of AR 97-4(9) and Chavez.  In particular, while the ALJ certainly recognized the law

15 regarding the presumption of continuing non-disability and the plaintiff's ability to rebut that

16 presumption, the court cannot find any indication in the ALJ's decision that he actually adopted

17 such a presumption and found that plaintiff had not rebutted it.  In fact, the decision reflects that,

18 rather than simply relying on the presumption of continuing non-disability, the ALJ actually

19 conducted an independent analysis of the record.  Nowhere in the decision does the ALJ state

20 that plaintiff has not demonstrated changed circumstances such that reliance on the presumption

21 would be appropriate.   The court, therefore, rejects this claim of error.

22         **C.      Plaintiff's Obesity**

23             Plaintiff asserts that, while obesity is no longer a listed impairment, it still must be

24 considered to determine whether it is a severe impairment.  Specifically, plaintiff states that the

25 ALJ was required to consider the effect of her obesity, alone and in combination, on her other

26 impairments, on her ability to work, and on her general health.  See Celaya v. Barnhart, 332 F.3d

1177, 1181 (9th Cir. 2003).

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).[4]  In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  See 20 C.F.R. §§ 404.1508, 416.908.

In 1999, obesity was removed from the Listing of Impairments.  Obesity may still enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system."  Celaya, 332 F.3d at 1181 n.1.  Thus, as part of his duty to develop the record, the ALJ is required to consider obesity in a multiple impairment analysis, but only where it is "clear from the record that [the plaintiff's] obesity . . . could exacerbate her reported illnesses."  Id. at 1182; see also Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that a multiple impairment analysis is not required where "the medical record is silent as to whether and how claimant's obesity might

---

[4]        Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

have exacerbated her condition" and "the claimant did not present any testimony or other

evidence . . . that her obesity impaired her ability to work").  Where a multiple impairment

analysis is not required, the ALJ properly considers obesity by acknowledging the plaintiff's

weight in making determinations throughout the sequential analysis.  See Burch, 400 F.3d at

684.    As to plaintiff's obesity, the ALJ noted the following throughout the hearing decision:

> On 9-19-01, the claimant weighed 218 pounds . . .
>
> * * *
>
> On 3-7-01, the claimant was noted to weigh 219 pounds . . .  By 11-5-01,
> the claimant's weight was 214 pounds . . .  By 2-15-02, the claimant's
> weight was 221 pounds . . .
>
> * * *
>
> An Orthopedic evaluation was performed on May 28, 2004 . . .  The
> claimant was noted to . . . weigh[] 217 pounds . . .  She was morbidly
> obese . . .
>
> * * *
>
> [At the hearing] [s]he gave her weight as 233 pounds . . .

Plaintiff argues that the ALJ erred in three ways with respect to her obesity:

> 1.    The ALJ improperly failed to consider plaintiff's obesity as a medically
> determinable impairment;
>
> 2.    The ALJ improperly failed to consider plaintiff's obesity as severe;
>
> 3.    The ALJ improperly failed to consider plaintiff's obesity when
> considering whether plaintiff's combined impairments were medically
> equal to any listed impairments; and
>
> 4.    In assessing plaintiff's residual functional capacity, the ALJ improperly
> failed to consider the functional imitations resulting from plaintiff's
> obesity.

As in Burch, plaintiff's arguments rely almost entirely on Celaya.  And, like Burch, plaintiff

raises the same arguments as to the ALJ's consideration of obesity.

With respect to plaintiff's first two arguments that the ALJ improperly failed to

consider her obesity as a medically determinable impairment of sufficient severity – step-two

1    determinations – she could not have been prejudiced because this step was resolved in her favor

2    when the ALJ determined that she did in fact have severe impairments.[5]  See Burch, 400 F.3d at

3    682 ("Assuming without deciding that this omission constituted legal error, it could only have

4    prejudiced Burch in step three or step five because the other steps, including [step two], were

5    resolved in her favor").

6            As to plaintiff's third argument that the ALJ failed to consider whether her

7    obesity combined with other impairments to equal a listed impairment, the court in Burch

8    addressed this same argument and stated that an ALJ's failure to consider equivalence is not

9    error where the plaintiff does not present evidence in support of equivalence (i.e., evidence

10   showing that obesity impairs the ability to work).  See id. at 683.  In Burch, the only evidence

11   relating to the plaintiff's obesity were notes from doctors observing her weight gain.  See id.

12   And, as in Burch, the record in this case reflects that the only evidence concerning plaintiff's

13   obesity are doctors' observations as to her weight, height, and heart function over time.

14   Specifically, no medical source has opined that plaintiff's obesity in any way limits her

15   functioning.  Further, plaintiff did not testify that she was limited by her weight.[6]  For these

16   reasons, the ALJ did not err with respect to an equivalency analysis.

17           As to plaintiff's fourth argument that the ALJ failed to properly consider her

18   obesity in determining her residual functional capacity, that argument was also addressed in

19   Burch.  The court concluded that, because the plaintiff had not presented any evidence of a

20   functional limitation caused by her obesity, the ALJ properly considered obesity by

21   acknowledging doctors' observations concerning the plaintiff's weight in making a residual

22   _____

23           [5]     The ALJ found that "[t]he claimant has an impairment or combination of
     impairments considered severe based on the requirements in the Regulations."

24

25           [6]     As plaintiff notes, she did report that she cannot walk more than 40 feet or stand
     for more than five minutes.  However, she stated that these limitations were "due to pain" and
     not obesity.  Specifically, plaintiff never reported that the pain she was experiencing was caused

26   by her obesity.

1  functional capacity determination.  See id. at 683-84.  Similarly, plaintiff in this case has not

2  presented any evidence of a causal link between her obesity and a functional limitation.

3          Finally, the court considers whether the ALJ should have conducted a multiple

4  impairment analysis of plaintiff's obesity.  Because, as discussed above, there is no evidence of

5  an impact on plaintiff's functioning caused by obesity, the ALJ was not required to conduct such

6  an analysis.  See Celaya, 332 F.3d at 1181-82, Burch, 400 F.3d at 682.

7          In sum, the court finds that the ALJ did not err with respect to plaintiff's obesity.

8      **D.     Medical Opinions**

9          The weight given to medical opinions depends in part on whether they are

10  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

11  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

12  professional, who has a greater opportunity to know and observe the patient as an individual,

13  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

14  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

15  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

16  (9th Cir. 1990).

17          In addition to considering its source, to evaluate whether the Commissioner

18  properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

19  in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

20  uncontradicted opinion of a treating or examining medical professional only for "clear and

21  convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

22  While a treating professional's opinion generally is accorded superior weight, if it is contradicted

23  by an examining professional's opinion which is supported by different independent clinical

24  findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

25  1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

26  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See

1    Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough

2    summary of the facts and conflicting clinical evidence, states her interpretation of the evidence,

3    and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent

4    specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or

5    examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining

6    professional, without other evidence, is insufficient to reject the opinion of a treating or

7    examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to

8    any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d

9    1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported

10   opinion); see also Magallanes, 881 F.2d at 751.

11             Plaintiff challenges the ALJ's analysis of the following medical source records

12   and opinions: (1) Salud Clinic; (2) Dr. O'Brien; (3) Dr. Jansen;(4) Dr. Abrinko; and (5) Dr.

13   Moghaddas.

14             1.    Salud Clinic

15             The ALJ thoroughly summarized the Salud Clinic records and stated:

16             Records from Salud Clinic show the claimant was treated for a variety of
               complaints from 5-5-99 to 4-16-03; including back pain in connection
17             with falling off a chair, neck and shoulder pain, bronchitis, and headaches.
               Examination revealed no spine tenderness to palpation.  The claimant was
18             assessed chronic pain/fibromyalgia, narcotic dependence on 4-9-01, and
               Celexa increased to 40 mg.  The claimant also had complaints of chronic
19             abdominal pain later determined to be non-ulcer dyspepsia.  The claimant
               also alleged complaints of hypertension, chronic dyspepsia, chronic
20             fatigue syndrome, chronic headaches, depression, and chronic narcotic use
               (prescription).  On 9-19-01, the claimant weights 218 pounds, her blood
21             pressure was deemed stable at 130/80, and the bronchitis was resolved.
               She was referred to Dr. Katz for chronic pain follow-up.  On 2-8-02 the
22             claimant was still complaining of chronic pain, facial pain and coughing
               with phlegm.  The claimant was feeling better by 2-19-02.  The claimant
23             still alleged some back pain with radiation down her legs into bi[g] toe;
               the physician opined physical pain most definitely affected by mental state
24             (depressed mood, angry).  The claimant was advised to continue
               medications.

25             * * *

26

. . . [T]he medical records from Salud Clinic show the claimant had been prescribed a variety of medications. On 3-7-01 the claimant was noted to weigh 219 pounds with a blood pressure of 132/74. She was upset about tapering prescribed narcotic doses; wanted her Tylenol #3 and Diazepam increased stating she "fell off a chair and hurt my back" this week and headaches had increased. She states having increased anger on Effexor and discontinued it prior to visit. Examination revealed [no] spine tenderness to palpation but claimant was **very dramatic with trembling during exam, but was intact neurologically**. The claimant was assessed narcotic analgesic dependence, chronic low back, neck, and shoulder pain; Celexa 20 mg prescribed for pain control and referral for chronic pain consult issued. A 7-21-01 note indicated the claimant overusing her medication and requesting more. On 8-3-01, she was upset that the Tylenol #3 and Diazepam were tapered. She displayed moderate distress and crying. She was noted to have muscle tenderness and displayed **excessive groaning and jumping** during palpation of lumbar spine. The claimant's cough was determined to be bronchitis and medication was provided. By 11-5-01, the claimant's weight was 214 pounds, blood pressure 130/90, and she stated she was **riding her bicycle 4-6 miles a day, and her headaches were better**. By 2-15-02, the claimant's weight was 221 pounds, blood pressure 130/80, face tenderness was resolved, sinusitis was improving, and pneumonia was ruled out. A chest x-ray for cough, fever, chest pain, and shortness of breath revealed no radiographic evidence of active intrathoracic disease. By 2-19-02, the claimant was feeling better, through still tired off and on, the cough had decreased; Flonase helped with sinusitis, and the bronchitis was resolving. On 4-10-02, the claimant was told to continue medication for low back pain; educated about taking it easy on her back and **decrease smoking**. The undersigned does not assign significant weight to these records. Although the claimant alleges significant back pain, there are no supportive objective findings (i.e., x-ray, MRI, etc.). (bold in original).

* * *

The voluminous additional records from Salud Clinic show the claimant was treated for various ailments, underwent a variety of tests, had volumes of subjective complaints, and was prescribed a wide variety of medications. Although the claimant alleged fatigue, chest pain, shortness of breach, nausea and vomiting associated with abdominal pain, a chest x-ray on 4-28-97 was negative for active infiltrates, atelectasis, or pleural effusion. A 3-20-98 chest x-ray revealed no acute cardiopulmonary disease and no evidence of pneumonia or active tuberculosis; and a baseline Electrocardiogram on 4-22-98 for atypical chest pain, rule out myocardial ischemia was normal; the stress Echocardiogram while normal, also revealed the claimant very emotional and crying during the entire test, and having a great deal of difficulty walking on the treadmill which appeared more of a psychological than physical problem. Baseline and stress Echocardiograms were normal. A CT scan of the abdomen on 3-17-95 was negative An upper Abdominal Ultrasound on 4-28-97 revealed no pathologic process, and no evidence of cholelithiasis. The undersigned does not give significant weight to these records as they do

not contain objective findings supporting the claimant's alleged impairments.

Plaintiff concedes the ALJ's summary of the Salud Clinic records is accurate, arguing only that the ALJ failed to consider a June 23, 1997, MRI in determining not to give significant weight to these records.

A review of the report of the June 23, 1997, MRI shows that it was prepared by Sutter Davis Hospital at the request of Rosalind Hsia, M.D., and that the report is included as part of Dr. Hsia's file.  Therefore, the ALJ did not err with respect to the Salud Clinic records by not considering among them this MRI.[7]

2.   Dr. O'Brien

Plaintiff was examined by Janet O'Brien, M.D., an agency internal medicine specialist.  As to Dr. O'Brien, the ALJ stated:

> The claimant underwent an Internal Medicine evaluation on June 21, 2002, for complaints of low back pain, coronary artery disease with myocardial infarction, and depression.  The claimant alleged daily, sharp, throbbing, burning pain in the lumbar spine radiating into the left lower extremity to the big toe but, improved with pain medication, but returns.  She alleged a myocardial infarction at 27; she says she was not using drugs at that time, but was using some kind of street drugs a month prior.  She has occasional chest pain but cannot estimate the frequency or quality; just chest pain "a few times" in the last 3 months; she uses Verapamil for chest pain.  She initially stated "I don't think I'm depressed," but has been on Celexa a long time and says "I suppose it's for depression."  The claimant stated she can walk 5-10 minutes before stopping due to fatigue and low back pain.  She says picking up items cause back pain and she will have to take a nap.  She occasionally goes out with a friend, drives to the store, and cleans her room.  She does laundry, grocery shopping on her bicycle, but does not cook (she doesn't know how).  She stated she last worked in 1994 as a laborer.  The claimant smoked one-half pack of cigarettes daily.  The claimant was diagnosed

---

[7]      It should be noted that the June 23, 1997, MRI was reviewed by John Chu, M.D., an agency examining orthopedic surgeon who examined plaintiff in 2004.  Dr. Chu noted the MRI in his report as follows: "[Plaintiff] reports having an MRI done, which had shown a disc bulge at L4-S1 level."  Nonetheless, Dr. Chu opined that plaintiff has a greater residual functional capacity than that adopted by the ALJ.  Plaintiff does not challenge Dr. Chu's report.

The record also reveals that Dr. O'Brien noted the June 23, 1997, MRI in her report.  While plaintiff challenges other aspects of the ALJ's consideration of Dr. O'Brien's opinion, she does not raise the MRI in this context.

with low back pain without evidence of radiculopathy, coronary artery disease per claimant; doubt angina, and probable depression. The claimant was assessed able to perform medium work with postural limitations only.

In the context of his discussion of Dr. Chu's report, the ALJ added:

. . . The undersigned notes the reviewed medical records from Dr. O'Brien, while indicating low back pain, [are] without evidence of radiculopathy; [Dr. O'Brien] also noted the claimant's hypersensitivity to touch of her lumbar spine.

Plaintiff argues that, while the ALJ accepted Dr. Chu's assessment of plaintiff's postural limitations – that plaintiff was able to stand/walk six hours in an eight-hour workday – he offered no comment on Dr. O'Brien's more narrow assessment that plaintiff could stand/walk for only two hours in an eight-hour day and a restriction to walking one block or more over rough or uneven surfaces. A review of the hearing decision reflects that plaintiff is incorrect in this assertion. As to the narrower stand/walk assessment, the ALJ stated:

. . . Here, the undersigned finds that there is no evidence to support the claimant only being able to stand/walk 2 hours in an 8-hour workday as the most recent Orthopedic exam [by Dr. Chu in 2004] did not show any limitations upon exam of the lower extremities.

This is a specific and legitimate reason for rejecting Dr. O'Brien's assessment of plaintiff's stand/walk ability because, logically, the more recent assessment is a better measure of the plaintiff's capabilities. Moreover, this reason is supported by substantial evidence in the form of Dr. Chu's opinion.

3.    Dr. Jansen

Plaintiff's medical file was evaluated by agency consultant George A. Jansen, M.D., who prepared a physical residual capacity assessment on July 3, 2002. Plaintiff argues that the ALJ erred by finding that Dr. Jansen's residual functional capacity assessment was not supported by the evidence. In response, defendant asserts that, because Dr. Jansen's opinion was contradicted by the opinions of Drs. O'Brien and Chu, there is still substantial evidence to

17

1  support the ALJ's disability determination.[8]

2        The only discussion by the ALJ of Dr. Jansen's assessment is as follows:

3      . . . A physical residual functional capacity assessment was also issued
that included lifting/carrying 10 pounds frequently and [20 pounds]

4  occasionally, standing/walking at least 2 hours in an 8-hour workday,
sitting about 6 hours in an 8-hour workday, and limitations for

5  pushing/pulling with lower left extremity.  The claimant could perform
postural activities on an occasional basis.  Here, the undersigned finds that

6  there is no evidence to support the claimant only being able to stand/walk
2 hours in an 8-hour workday as the most recent Orthopedic exam did not

7  show any limitations upon exam of the lower extremities.

8  The "most recent Orthopedic exam" to which the ALJ refers is Dr. Chu's 2004 assessment.  As

9  with Dr. O'Brien, the court finds that the reason cited by the ALJ for rejecting Dr. Jansen's

10  narrower stand/walk assessment is a specific and legitimate reason supported by substantial

11  evidence in the record.

12        4.    <u>Dr. Abrinko</u>

13        On June 23, 2002, plaintiff underwent a complete psychiatric evaluation

14  performed by Paul Abrinko, M.D., an agency psychiatrist.  As to Dr. Abrinko, the ALJ stated:

15      When evaluated by Paul Abrinko, a Psychiatrist on June 23, 2002, the
claimant's chief complaint was "I can't do a lot of stuff I used to and it

16  makes me angry."  There were no psychiatric records to review.  The
claimant stated that **her back constantly hurting puts her in a bad**

17  **mood.  She is often cranky, irritable and angry, loses her temper**
**easily, occasionally experiences suicidal ideation when feeling like a**

18  **burden to others, but has no intention or plan of committing suicide.**
**She denied feeling sad all the time, does not cry frequently, and is still**

19  **able to enjoy her music, game boy and time with friends**.  She
complained of low energy and trouble understanding and concentrating on

20  what she's reading but indicated this difficulty predates her pain and
anger.  Although she has some symptoms of depression and takes 40 mg

21  Celexa daily, she does not find it helps; other medications include
Verapamil, Dyazide, Tagamet, Tylenol, Diazepam, and Aspirin.  The

22  claimant, who lives with her family, is able to bathe and dress herself, do

23            [8]     Dr. Jansen opined that plaintiff could occasionally lift 20 pounds and frequently

24  lift ten pounds; that plaintiff could stand/sit for no more than two hours in an eight-hour
workday; that plaintiff could sit for six hours; that plaintiff had limitations with respect to lower

25  extremity push/pull; and that plaintiff had postural limitations to only occasionally climbing,
stooping, kneeling, crouching, or crawling.  Thus, contrary to defendant's characterization, Dr.

26  Jansen's opinion is consistent with Dr. O'Brien's opinion.

errands and shopping, pay bills and handle cash appropriately, go out alone, and maintain a fair relationship with family and friends. **On a daily basis, she gets out of bed, plays Game Boy, and smokes cigarettes**. (bold in original).

Mental Status exam showed the claimant alert and oriented in all spheres and she appeared to be of at least average intelligence. The claimant's mood was "okay," affect was blunted with occasional faint smiling and was appropriate to topic; she was not tearful. Speech was not pressured with normal rate and tone. There was no obvious psychomotor agitation but there was obvious psychomotor retardation. She appeared genuine and truthful; no evidence of exaggeration or manipulation and did not appear to be under the influence of drugs or alcohol. Thought process was coherent and organized; no tangentiality or loosening of associations; no bizarre or psychotic thought content displayed; no suicidal, homicidal, or paranoid ideation displayed; and she denied recent auditory/visual hallucinations. Insight and judgment appeared to be intact regarding current situation. The examiner noted the claimant's long but remote history of polysubstance abuse and her current complaints of unremitting back pain and symptoms of chronic fatigue indicating the **main emotional impact these symptoms have is on her frustration tolerance and irritability. The examiner stated that from a psychiatric standpoint the claimant's condition was expected to improve within 12 months with active treatment. She was functionally assessed as only moderately limited in relating and interacting with supervisors, co-workers, and the public due to her irritability. She was able to understand, remember, and carry out simply one or two step job instructions and complex instructions, able to maintain concentration/attention, persistence of pace, able to associate with day-to-day work activity (attendance and safety); adapt to the stresses common to a normal work environment; maintain regular attendance in the workplace and perform work activities on a consistent basis, and able to perform work activities without special or additional supervision. She was capable of handling funds**. The undersigned gives significant weight to this evaluation which shows the claimant mentally intact; stating a chief complaint of "I can't do a lot of stuff I used to and it makes me angry," and her back pain putting her in a bad mood. The undersigned noted there were no psychiatric records to review; the report contained subjective statements by the claimant; no objective findings; a prognosis of improvement within 12 months with active treatment; and the only limitations was due to the claimant's irritability not objective findings. (bold in original).

The "only limitation" referred to in the above discussion is Dr. Abrinko's opinion that plaintiff was "[m]oderately limited in ability to relate and interact with supervisors, co-workers, and the public due to her irritability." Plaintiff argues that the ALJ erred in rejecting this limitation from his residual functional capacity finding even though another psychiatric examiner found the

19

1    same limitation.

2          As outlined above, the ALJ may reject a medical opinion for specific and

3    legitimate reasons supported by the record.  Here, the ALJ did not accept Dr. Abrinko's limited

4    assessment of plaintiff's ability to relate and interact with others because it was based on

5    subjective complaints rather than objective observations.  The court finds that this is a specific

6    and legitimate reason.  The next question is whether this reason is supported by substantial

7    evidence in the record.  In the limited context of just Dr. Abrinko's opinion, it is clear that, in the

8    course of his evaluation of plaintiff, the only basis for the limitation was plaintiff's subjective

9    complaint of irritability.

10                5.    <u>Dr. Moghaddas</u>

11          Plaintiff argues that the ALJ erred with respect to Dr. Abrinko because the

12   limitation for interacting with others was also opined by Mehdi Moghaddas, M.D., an agency

13   psychiatrist who examined plaintiff on May 7, 2004, yet the ALJ did not include this limitation

14   in his residual functional capacity assessment.  As discussed above, the court does not find error

15   with respect to the ALJ's consideration of Dr. Abrinko's opinion because the basis for Dr.

16   Abrinko's limitation was subjective complaints only.  However, in Dr. Moghaddas' report, he

17   offers the following functional assessment:

18              Based on psychiatric point of view, [plaintiff] is capable of following
              simple or complex directives.  She shows no significant impairment of
19              concentration or pace.  She shows some mild-to-moderate degree of
              difficulty in getting along with potential coworkers.  She shows no
20              difficult in taking supervision and shows no problem in competing in
              workplace.
21

22   Specifically, Dr. Moghaddas did <u>not</u> say that the limitation was based on plaintiff's subjective

23   complaint of irritability.  Rather, Dr. Moghaddas opined that plaintiff "shows" this limitation,

24   which must refer to something the doctor observed during the course of his evaluation.  As to Dr.

25   Moghaddas, the ALJ stated:

26          A Psychiatric evaluation was performed on May 7, 2004.  The claimant's

chief complaint was she said that she had a "bad temper."  The claimant had been treated for her mood disorder with Haldol, Xanax, and Topomax by Dr. Graham.  The claimant reported severe mood changes and easily angered.  She alleged feeling like resorting to violence, but has not been physically violent.  She alleged feeling chronically depressed and violent since being pushed down in a tub and hurting her back several years ago.  She had a history of heav[y] drinking and smoking and blackouts as a teenager, but did not seem to be under any influence of drugs or alcohol at present.  There was no record of psychiatric distress; and alert and oriented in all spheres.  Her mood was dysphoric; no extreme or significant [sign] of lability or mood towards the session; thinking was organized without any tangentiality circumstantiality, or loosening of association; no evidence of paranoia, and she was capable of doing serial 3's with minimal errors and good pace.  She denied an[y] suicidal ideation, hopelessness or helplessness.

The claimant was diagnosed Axis I: Dysthymic disorder; Mood disorder, NOS; Axis II: Borderline personality disorder; Axis III: History of chronic back pain, back injuries, rheumatoid arthritis, and given history of fibromyalgia otherwise per treating physician; Axis IV: Psychosocial stressors during past year; unemployment, past abuses, and multiple chronic medical conditions; and Axis V: Current and last 12 months GAF: 60.  The examiner stated the claimant has a history of hypnosedative dependence, and despite being chronically depressed and dysphoric, **she is responding fairly well to current medication, and with appropriate treatment, prognosis is considered to be good.  The claimant was functionally assessed capable of following simple or complex directives, no significant impairment of concentration or pace, some mild-to-moderate degree of difficulty in getting along with potential co-workers, but no difficulty in taking criticism from supervisors and no problem competing in the workplace.  The claimant was deemed fully capable of handling her funds.**  The undersigned gives significant weight to this evaluation which supports the earlier Psychiatric evaluation [performed by Dr. Abrinko) of no significant mental impairment, and a good prognosis as the claimant is responding well to current medication. . . (bold in original).

As to the limitation of mild-to-moderate difficulty getting along with others, the

ALJ made no comment, simply stating that he "gives significant weight to this evaluation."

However, the ALJ did not include this limitation in his residual functional capacity finding.

Thus, the ALJ effectively rejected Dr Moghaddas' limitation without providing any reasons for

doing so.  While the ALJ properly rejected Dr. Abrinko's similar limitation (as discussed above),

///

1   the ALJ effectively rejected Dr. Moghaddas' same limitation without comment.[9]  Because Dr.

2   Moghaddas is an examining doctor, and because his limitation is not contradicted (in fact, it is

3   consistent with Dr. Abrinko's opinion), the ALJ should have provided clear and convincing

4   reasons for not accepting Dr. Moghaddas' limitation in his functional capacity assessment.

5        A remand is appropriate to allow the ALJ to consider Dr. Moghaddas' limitation

6   and, if rejected, to provide clear and convincing reasons for doing so.

7        **E.      Lay Witness Testimony**

8        Plaintiff claims that the "ALJ failed to expressly determine to disregard the lay

9   testimony from James Phillips, Plaintiff's husband, and to give reasons germane to this witness

10  for doing so."   Mr. Phillips testimony is in the form of a "Daily Activities Questionnaire"

11  completed on April 27, 2002.  Having carefully reviewed the ALJ's hearing decision, the court

12  finds that the ALJ ignored the questionnaire.

13        In determining whether a claimant is disabled, an ALJ generally must consider lay

14  witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

15  919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

16  testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

17  evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

18  F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

19  of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

20  919.

21        The ALJ, however, need not discuss all evidence presented.  See Vincent on

22  Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984).  Rather, he must explain

23  why "significant probative evidence has been rejected."  Id. (citing Cotter v. Harris, 642 F.2d

24

25     [9]     Because the opined limitations arose from different examinations which occurred
    two years apart, it is not logical to conclude that the reason the ALJ gave for rejecting Dr.
26  Abrinko's limitation would transfer to Dr. Moghaddas' limitation.

1    700, 706 (3d Cir.1981).  Applying this standard, the court held that the ALJ properly ignored

2    evidence which was neither significant nor probative.  See id. at 1395.  As to a letter from a

3    treating psychiatrist, the court reasoned that, because the ALJ must explain why he rejected

4    uncontroverted medical evidence, the ALJ did not err in ignoring the doctor's letter which was

5    controverted by other medical evidence considered in the decision.  See id.  As to lay witness

6    testimony concerning the plaintiff's mental functioning as a result of a second stroke, the court

7    concluded that the evidence was properly ignored because it "conflicted with the available

8    medical evidence" assessing the plaintiff's mental capacity.  Id.

9            In Stout v. Commissioner, the Ninth Circuit recently considered an ALJ's silent

10   disregard of lay witness testimony.  See 454 F.3d 1050, 1053-54 (9th Cir. 2006).  The lay

11   witness had testified about the plaintiff's "inability to deal with the demands of work" due to

12   alleged back pain and mental impairments.  Id.   The witnesses, who were former co-workers

13   testified about the plaintiff's frustration with simple tasks and uncommon need for supervision.

14   See id.  Noting that the lay witness testimony in question was "consistent with medical

15   evidence," the court in Stout concluded that the "ALJ was required to consider and comment

16   upon the uncontradicted lay testimony, as it concerned how Stout's impairments impact his

17   ability to work."  Id. at 1053.   The Commissioner conceded that the ALJ's silent disregard of the

18   lay testimony contravened Ninth Circuit case law and the controlling regulations, and the Ninth

19   Circuit rejected the Commissioner's request that the error be disregarded as harmless.  See id. at

20   1054-55.  The court concluded:

21          Because the ALJ failed to provide any reasons for rejecting competent lay
            testimony, and because we conclude that error was not harmless,
22          substantial evidence does not support the Commissioner's decision . . .

23   Id. at 1056-67.

24          From this case law, the court concludes that the rule for lay witness testimony

25   depends on whether the testimony in question is controverted or consistent with the medical

26   evidence.  If it is controverted, then the ALJ does not err by ignoring it.  See Vincent, 739 F.2d

1    at 1395.  If, however, lay witness testimony is consistent with the medical evidence, then the

2    ALJ must consider and comment upon it.  See Stout, 454 F.3d at 1053.  However, the

3    Commissioner's regulations require the ALJ to consider lay witness testimony in certain types of

4    cases.  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 88-13.  That ruling

5    requires the ALJ to consider third-party lay witness evidence where the plaintiff alleges pain or

6    other symptoms that are not shown by the medical evidence.  See id.  Thus, in cases where the

7    plaintiff alleges impairments, such as chronic fatigue or pain (which by their very nature do not

8    always produce clinical medical evidence), it is impossible for the court to conclude that lay

9    witness evidence concerning the plaintiff's abilities is necessarily controverted such that it may

10   be properly ignored.  Therefore, in these types of cases, the ALJ is required by the regulations

11   and case law to consider lay witness evidence.

12           Because the ALJ in this case ignored the questionnaire completed by Mr. Phillips,

13   if Mr. Phillips' statements are consistent with the medical evidence, a remand would be

14   appropriate to allow the ALJ to consider and comment upon the evidence.   Or, if this case is one

15   of the types of cases in which the ALJ is required by the regulations to consider lay witness

16   evidence, a remand would be appropriate.  Otherwise, there is no error.

17           A review of the record reflects that the questionnaire completed by Mr. Phillips is

18   divided into the following relevant categories: (1) Activities of Daily Living; (2) Social

19   Functioning; and (3) Personal Information.   With respect to activities of daily living, Mr.

20   Phillips stated:

21           Upon rising [plaintiff] takes her medication to keep from vomiting.  Then
             she takes her heart medication, ulcer medication, etc.  She watches
22           cartoons, rides her bicycle to the local market to buy a sandwich, stops at
             the local park to eat and rest, then peddles home, and naps for several
23           hours, wakes up, goes out and sits at her church and plays hand-held video
             games, then she goes home to sleep.
24
             * * *
25   ///

26   ///

1         [Plaintiff] bathes once every 2-4 days, because of pain.

2         * * *

3         [Plaintiff] doesn't cook.  She can make a sandwich if she has freedom of movement in a kitchen.

4

5 Mr. Phillips also stated that he helps plaintiff with shopping and that plaintiff's father, with

6 whom she lives, pays her bills.  Mr. Phillips stated that plaintiff rides her bicycle every day for

7 exercise.   As to social functioning, Mr. Phillips stated:

8         Pain causes [plaintiff] to be short tempered, nor does she suffer fools gladly.  Loves her mother-in-law, husband, and husband's brother-in-law.

9         Likes some teenagers of her acquaintance.  Does not get along well with stepsons.

10         * * *

11

12         [Plaintiff] used to attend concerts, go camping, fishing, walking, visit with family and friends, worked a very physically demanding job, enjoyed physical exercises and participated greatly in physical relations with

13         husband.  Twice a week is now the most she can enjoy sexual relations, and even then, the physical exertion is usually more than she can tolerate.

14

15 Mr. Phillips also stated that plaintiff now only attends entertainment activities twice a year.

16 Finally, as to personal information, Mr. Phillips stated:

17         [Plaintiff] cannot concentrate on reading.  Can remember small portion of what she's read, has to have much of that explained to her.

18

19         * * *

20         [Plaintiff] does not like being looked at.  Very security conscious . . . Afraid husband will be stolen away by younger/healthier woman, or

21         husband will be killed by fire or by drowning.

22 Mr. Phillips also stated that plaintiff has a difficult time following instructions, unless they are

23 very simple and that she can only finish a task if she is allowed to rest often.  He added that

24 plaintiff is easily fatigued.

25 / / /

26 / / /

1      In this case, plaintiff alleges impairments due to chronic pain and chronic fatigue.

2  Clearly, Mr. Phillips' statements go to plaintiff's functioning in light of these impairments.

3  Because plaintiff's chronic pain and fatigue impairments produce symptoms which often cannot

4  be corroborated by clinical medical evidence, this is one of the types of cases in which the ALJ

5  is required to consider lay witness evidence of the kind provided by Mr. Phillips.  The ALJ in

6  this case erred by ignoring Mr. Phillips' statements.  While defendant may be correct that, even

7  had the ALJ considered this evidence, it would have made no difference, that is not for this court

8  to say.[10]  A remand is appropriate to allow the ALJ to consider and comment upon this evidence.

9          **F.    Residual Functional Capacity Finding**

10     Residual functional capacity is what a person "can still do despite [the

11  individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

12  Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

13  "physical and mental capabilities").  Plaintiff argues that the ALJ erred in two ways with respect

14  to his residual functional capacity finding:

15          1.    The ALJ erred by failing to properly consider the symptoms of Plaintiff's
               chronic fatigue syndrome in determining Plaintiff's residual functional
16              capacity; and

17          2.    The ALJ erred by improperly failing to consider the possible side effects
               of Plaintiff's medications in determining Plaintiff's residual functional
18              capacity.

19     As discussed in detail above, the court finds that the ALJ erred with respect to his

20  rejection of Dr. Moghaddas' limitation for getting along with others and with respect to

21  consideration of Mr. Phillips' responses to a questionnaire concerning plaintiff's functioning.

22  Because a remand is necessary to allow the ALJ to properly consider this evidence, the ALJ's

23  _____

24      [10]     Defendant appears to argue that any error is harmless:

25          . . . Moreover, even if the Plaintiff's husband's statements were credited,
          they would not directly support a finding of disability.

26  The court rejects this argument as to lay witness testimony.  See Stout, 454 F.3d at 1055.

1  residual functional capacity finding could very well change.  Thus, it would be futile to offer an

2  opinion as to the current residual functional capacity finding at this time.  In particular, upon

3  further consideration of Mr. Phillips' statements, the ALJ could conclude that there is substantial

4  evidence to support plaintiff's allegation that her chronic fatigue syndrome impairment limits her

5  functional capacity beyond what the ALJ has already found.

6          With respect to plaintiff's second argument that the ALJ did not consider the

7  effects of medications in his residual functional capacity finding, the court notes that there is

8  nothing in the errors found in this opinion which would go to the effects of medications.

9  Further, the court agrees with defendant that plaintiff has not presented any objective clinical

10 evidence to support limiting side effects.  As plaintiff admits in her brief, her "evidence" consists

11 of her subjective testimony, her subjective complaints during the course of her treatment at Salud

12 Clinic, and an evaluation by Dr. Graman which notes plaintiff's subjective complaint of limiting

13 side effects.  Plaintiff does not point to any place in the record where a medical professional has

14 suggested the existence of disabling side effects based on objective clinical evidence.

15         **G.    Application of the Grids**

16         The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

17 disability for various combinations of age, education, previous work experience, and residual

18 functional capacity.  The Grids allow the Commissioner to streamline the administrative process

19 and encourage uniform treatment of claims based on the number of jobs in the national economy

20 for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

21 460-62 (1983) (discussing creation and purpose of the Grids).

22         The Commissioner may apply the Grids in lieu of taking the testimony of a

23 vocational expert only when the grids accurately and completely describe the claimant's abilities

24 and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

25 Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

26 Grids if a claimant suffers from non-exertional limitations because the Grids are based on

strength factors only.  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).  "If a

claimant has an impairment that limits his or her ability to work without directly affecting his or

her strength, the claimant is said to have non-exertional . . . limitations that are not covered by

the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

even when a claimant has combined exertional and non-exertional limitations, if non-exertional

limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

In cases where the Grids are not fully applicable, the ALJ may meet his burden

under step five of the sequential analysis by propounding to a vocational expert hypothetical

questions based on medical assumptions, supported by substantial evidence, that reflect all the

plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

1341 (9th Cir. 1988).

In this case, plaintiff argus that the ALJ erred in applying the Grids because she

has non-exertional limitations.  Specifically, plaintiff asserts that the ALJ did not properly

consider either her postural limitations or her mental limitations.  As with the ALJ's residual

functional capacity assessment, on remand the ALJ could find that plaintiff has non-exertional

limitations which more than minimally limit her abilities.  If this proves to be the case, the ALJ

would obtain testimony from a vocational expert.  Therefore, it is premature to comment on the

ALJ's current application of the Grids.

/ / /

/ / /

/ / /

/ / /

# IV.  CONCLUSION

To summarize, the court has found error with respect to the ALJ's analysis of Dr. Moghaddas' opinion that plaintiff had mild-to-moderate limitation in getting along with others. The court has also found that the ALJ erred in ignoring Mr. Phillips' statements regarding plaintiff's functioning.  For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment is granted;

2.      The Commissioner's cross motion for summary judgment is denied;

3.      This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.

DATED:   September 18, 2006.

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE